UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHUOC CHAN TRAN, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TMC THE METALS COMPANY INC. F/K/A SUSTAINABLE OPPORTUNITIES ACQUISITION CORP., GERARD BARRON, and SCOTT LEONARD,<br><br>Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>JURY TRIAL DEMANDED</u><br><br><u>CLASS ACTION</u> |

Plaintiff Phuoc Chan Tran ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by TMC the metals company Inc. f/k/a Sustainable Opportunities Acquisition Corp. ("TMC" or the "Company"), as well as media and analyst reports about the Company and Company press releases.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants (defined below) who purchased or otherwise acquired the publicly traded securities of TMC between March 4, 2021 and October 5, 2021, both dates

inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      On March 4, 2021, DeepGreen Inc. ("DeepGreen") announced that it had entered into a business combination agreement with Sustainable Opportunities Acquisition Corporation ("SOAC"), a special purpose acquisition company ("SPAC") with a dedicated Environmental, Social, and Governance ("ESG") focus.  Upon closing of the merger, the combined company was renamed TMC the metals company Inc.  The combined company, TMC, began trading on the NASDAQ under the ticker symbol "TMC" on September 10, 2021.

3.      TMC is a Canadian deep-sea minerals exploration company focused on the collection, processing, and refining of polymetallic nodules found on the seafloor of the Clarion Clipperton Zone of the Pacific Ocean (the "CCZ").  The Company's purported mission is to supply metals for electric vehicle batteries with the least possible negative environmental and social impact.

4.      Deep sea exploration rights are regulated by the International Seabed Authority ("ISA"), which, since 1994, has been authorized by the United Nations to administer and regulate deep sea exploration and mining in international waters.

5.      TMC's primary assets are three exploration licenses granted by the ISA.  These licenses, which are held via three subsidiaries, are: (i) Nauru Ocean Resources Inc. ("NORI"); (ii) Marawa Research and Exploration Limited ("Marawa"); and (iii) Tongo Offshore Mining Limited ("TOML").

6.     On September 13, 2021, *Bloomberg* published an article revealing that two investors had failed to provide $330 million as part of the private investment in public equity ("PIPE") component of TMC's go-public deal.  The article also questioned TMC's "green credentials," revealing that "[e]nvironmentalists claim that TMC's activities will damage sensitive ecosystems and destroy vital biodiversity" and that "[s]ince the SPAC deal was announced in March, more than 500 scientists have signed a letter calling for a moratorium on deep-sea mining until the environmental risks are better understood."

7.     On this news, TMC's shares fell $2.45, or 20%, over the next two trading days to close at $10.00 on September 15, 2021, damaging investors.

8.     Then, on October 6, 2021, before market hours, market research firm Bonitas Research released a report detailing multiple issues plaguing TMC, including that: (i) the Company had overpaid on licenses to potential undisclosed insiders; (ii) the Company had artificially inflated exploration expenses by more than 100% in order to mislead investors about the scale of its operations; (iii) there are reasons to question the Company's ownership claim of NORI; and (iv) the Company's history of affiliating with bad actors.

9.     On this news, TMC shares fell $0.32 per share, or over 7%, to close at $4.14 per share on October 6, 2021, further damaging investors.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

12.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this judicial district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was economically damaged thereby.

16.     Defendant TMC purports to be a deep-sea minerals exploration company focused on the collection, processing, and refining of polymetallic nodules found on the seafloor of the CCZ of the Eastern Pacific Ocean.  The Company was formerly known as DeepGreen Inc. and changed its name to TMC the metals company Inc. in September 2021.

17.     Defendant TMC is incorporated in the Cayman Islands its head office at 595 Howe Street, Vancouver, BC, Canada.  TMC shares are listed on the NASDAQ under the ticker symbol "TMC."  Prior to the merger, the Company's ordinary shares were traded on the NYSE under ticker symbol "SOAC."

18.     Defendant Gerard Barron ("Barron") served as DeepGreen's Chairman and Chief Executive Officer since 2018.  Following the merger, Defendant Barron has served as TMC's Chief Executive Officer and Chairman of the Board.

19.     Defendant Scott Leonard ("Leonard") is and was at all pertinent times the Chief Executive Officer of SOAC.  Following the merger, Defendant Leonard has served as a Director of TMC.

20.     Defendants Barron and Leonard are collectively referred to herein as the "Individual Defendants."

21.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

22.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

23.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

24.     The Company and the Individual Defendants are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

25.     On March 4, 2021, the Company issued a press release, attached to SOAC's form 8-K filing with the SEC that same day, entitled "DeepGreen, Developer of the World's Largest Estimated Resource of Battery Metals for EVs, to Combine with Sustainable Opportunities Acquisition Corporation."   The press release announced that DeepGreen had entered into a definitive business combination agreement with SOAC, a SPAC "with a dedicated ESG focus and deep operational and capital market capabilities in the energy and resource sectors."   The press release also stated that the "transaction represents a pro forma equity value of US$2.9 billion" for the combined company, which will be renamed and operate under the name TMC upon closing.

26.     The March 4, 2021 Press Release also stated that "[t]he transaction includes an upsized ***US$330 million fully committed*** common stock Private Investment in Public Equity ("PIPE") at US$10.00 per share, anchored by an international consortium of strategic and institutional investors, including Allseas, adding to the list of existing strategic investors such as Maersk Supply Service and Glencore."  (Emphasis added).

27.     In the March 4, 2021 Press Release, Defendant Leonard stated the following about DeepGreen:

> We looked at over 100 companies, many of them in the EV and renewable energy space. DeepGreen stands above the rest. ***It offers a real, scalable solution to the raw materials problem, at a low production cost and with a significant reduction in the ESG footprint of metals.*** . . . We are convinced that The Metals Company is the ultimate answer to our thorough search for meaningful ESG impacts combined with tremendous financial upside.

> (Emphasis added).

28.     In the March 4, 2021 Press Release, Defendant Barron stated the following about the environmental impacts of TMC's deep sea mining: "The reality is that the clean energy transition is not possible without taking billions of tons of metal from the planet. ***Seafloor nodules offer a way to dramatically reduce the environmental bill of this extraction***. We are getting into this industry with a deep commitment to ocean health and a clear stop date in mind." (Emphasis added).

29.     The March 4, 2021 Form 8-K, which was signed by Defendant Leonard, further elaborated on the PIPE Financing, stating in pertinent part:

> Concurrently with the execution of the Business Combination Agreement, SOAC entered into subscription agreements (the "*Subscription Agreements*") with certain institutional and accredited investors, pursuant to which such investors agreed to subscribe for and purchase, and SOAC agreed to issue and sell to such investors, substantially concurrently with the Closing (as defined in the Business Combination Agreement), an aggregate of 33,030,000 shares of SOAC Common Shares for $10.00 per share, for aggregate gross proceeds of $330,300,000 (the "*PIPE Financing*"). The closing of the PIPE Financing is contingent upon, among other things, the substantially concurrent consummation of the Business Combination. The Subscription Agreements provide that SOAC will grant the investors in the PIPE Financing certain customary registration rights. The PIPE Financing is contingent upon, among other things, the substantially concurrent closing of the Business Combination.

30.     On April 22, 2021, in an interview with Kitco News, a metals and business news organization, Defendant Barron discussed the environmental impact of TMC's process of

collecting polymetallic nodules from the ocean floors, stating "when we bring them to shore and we turn them into metals, we ***generate zero tailings and zero waste***."  (Emphasis added).

31.     On April 8, 2021, SOAC filed with the SEC a prospectus on Form S-4 signed by Defendants Leonard and Barron.  On May 27, 2021, June 23, 2021, July 14, 2021, July 29, 2021, and August 5, 2021, SOAC filed revised versions of the prospectus for the merger on Forms S-4/A, which was declared effective on August 12, 2021.  On August 13, 2021, SOAC issued a Proxy Statement with the SEC on Form 424(b)(3) which was signed by Defendants Leonard and Barron. The Proxy Statement stated the following about the TOML exploration license:

> On March 31, 2020, DeepGreen entered into an acquisition agreement to acquire the polymetallic nodules business unit from Deep Sea Mining (the "TOML Acquisition"). As part of this acquisition, DeepGreen acquired various subsidiaries in the TOML group for a total purchase price of $32 million. TOML holds the TOML Exploration Contract with the ISA. The TOML Acquisition includes the exclusive rights held by TOML to explore for polymetallic nodules in an area covering 74,713 km2, a priority right to apply for an exploitation contract to collect polymetallic nodules in the same area, and some exploration related equipment. The TOML group also holds various patents and an application right with respect to a prospecting exploration license in the Republic of Kiribati.
>
> ***The purchase price of $32 million was settled through initial cash payments of $0.5 million in two tranches, the issuance of 7.8 million DeepGreen Common Shares at the mutually agreed price of $3.60 per share between both parties for a total amount of $28 million, $0.06 million payment to ISA on behalf of Deep Sea Mining and a deferred consideration of $3.44 million to be paid in tranches by June 30, 2021.***
>
> (Emphasis added).

32.     In the August 5, 2021 Form S-4, which was signed by Defendants Barron and Leonard, Defendants valued the TOML license at nearly $43 million:

**Reconciliation — Exploration Licenses**

A reconciliation of the Company's exploration licenses is as follows:

| | NORI License $ | Marawa Option $ | TOML License $ | Total $ |
|---|---|---|---|---|
| Balance at December 31, 2018 and 2019 | 250,000 | 198,855 | — | 448,855 |
| TOML Acquisition (*Note 5*) | — | — | 42,701,464 | 42,701,464 |
| **Balance at December 31, 2020** | **250,000** | **198,855** | **42,701,464** | **43,150,319** |

F-60

33.     The August 5, 2021 Form S-4 claimed that DeepGreen owns 100% interest in NORI:

**Consolidation**

These consolidated financial statements include the accounts of the Company (the "Parent") and its subsidiaries. The principal subsidiaries of the Company, their activities, and their geographic locations as at December 31, 2020 were as follows:

| Subsidiary | Principal Activity | Location | Proportion of Interest Held by the Parent |
|---|---|---|---|
| DeepGreen Engineering Pte. Ltd. ("DGE") | Mineral exploration | Singapore | 100% |
| DeepGreen Resources LLC ("DGL") | Holding Company | USA | 100% |
| NORI | Mineral exploration | Republic of Nauru | 100% |
| Nauru Education and Training Foundation Inc. ("NEAT") | Holding Company | Republic of Nauru | 100% |
| Nauru Health and Environment Foundation Incorporated ("NHEF") | Holding Company | Republic of Nauru | 100% |
| Tonga Offshore Mining Ltd. ("TOML") | Mineral exploration | Tonga | 100% |
| Koloa Moana Resources Ltd. ("Koloa Moana") | Holding Company | Canada | 100% |
| Offshore Minerals Pte. Ltd. ("Offshore Minerals") | Mineral exploration | Australia | 100% |
| DeepGreen TOML Singapore Ltd. (TOML Singapore") | Mineral exploration | Singapore | 100% |
| DeepGreen TOML Holding 1 ("TOML Hold 1") | Holding Company | British Virgin Islands | 100% |
| DeepGreen TOML Holding 1 ("TOML Hold 2") | Holding Company | British Virgin Islands | 100% |
| The Metals Company Nauru Holding LLC ("Nauru Holding") | Holding Company | USA | 100% |
| The Metals Company LLC ("TMC") | Holding Company | USA | 100% |

The transactions among the entities in the consolidated group pertain to the transfer of funds and the payment of third-party costs. All inter-group balances have been eliminated upon consolidation.

34.     The August 5, 2021 Form S-4 also revealed that the Company's exploration expenditures for NORI were approximately $33.5 million:

9

| For the year ended December 31, 2019 | General $ | NORI License $ | Marawa Option $ | Total $ |
|---|---|---|---|---|
| **Exploration expenses** | | | | |
| Exploration labour | — | 1,635,858 | 895,165 | 2,531,023 |
| Marine cruise | — | 27,039,041 | 1,120,737 | 28,159,778 |
| Common Share options-based payments *(Note 10)* | — | 769,175 | 508,385 | 1,277,560 |
| Amortization *(Note 7)* | — | 336,990 | — | 336,990 |
| External consulting | 19,578 | 4,834,170 | 563,210 | 5,416,958 |
| Travel, workshop and other | — | 785,638 | 322,281 | 1,107,919 |
| | 19,578 | 35,400,872 | 3,409,778 | 38,830,228 |

35.     The statements referenced in ¶¶ 25-34 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational, and financial results, which were known to Defendants or recklessly disregarded by them.   Specifically, Defendants made false and/or misleading statement and/or failed to disclose that: (1) the Company had significantly overpaid for the TOML acquisition to undisclosed insiders; (2) the Company had artificially inflated its NORI exploration expenditures to give investors a false scale of its operations; (3) the Company's purported 100% interest in NORI was questionable given prior disclosures to the ISA that NORI was wholly owned by two Nauruan foundations and that all future income from NORI would be used in Nauru; (4) Defendants had significantly downplayed the environmental risks of deep-sea mining polymetallic nodules and failed to adequately warn investors of the regulatory risks faced by the Company's environmentally risky exploitation plans; (5) the Company's PIPE financing was not fully committed and, therefore, the Company would not have the cash necessary for large sale commercial production; (6) as a result of the foregoing, the Company's valuation was significantly less than Defendants disclosed to investors; and (7) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

**The Truth Emerges**

36.     On September 13, 2021, *Bloomberg* published an article entitled "$500 Million of SPAC Vanishes Under the Sea: The Metal Company's controversial plan to mine the seafloor is a tale of questionable green credentials and SPAC disappointment."  The article revealed that "two unidentified investors [failed] to provide funds comprising two-thirds of TMC's $330 million PIPE (private investment in public equity)."  The article explained that PIPEs are "supposed to provide a guaranteed financial backstop so the target receives at least some cash" and "also help validate the value the SPAC has ascribed to the target."  The failure of some of TMC's PIPE investors was "embarrassing" and problematic because TMC "estimates that $7 billion is needed for large-scale production."  Moreover, according to the article, "the scale of TMC's cash shortfall suggests it has yet to convince capital markets that its multi-billion valuation is justified, given the risks."

37.     The *Bloomberg* article also questioned TMC's "green credentials."  Despite the Company's disclosures stating that mining nodules will help decarbonize the transport sector and thereby help solve the climate crisis, the Bloomberg article revealed that "[e]nvironmentalists claim that TMC's activities will damage sensitive ecosystems and destroy vital biodiversity."  The article also revealed that "[s]ince the SPAC deal was announced in March, more than 500 scientists have signed a letter calling for a moratorium on deep-sea mining until the environmental risks are better understood.  Large companies like BMW AG, Samsung Electronics Co. and Google have leant their support to a temporary ban."

38.     On this news, TMC's shares fell $2.45, or 20%, over the next two trading days to close at $10.00 on September 15, 2021, damaging investors.

39.     Then, on October 6, 2021, before market hours, market research firm Bonitas Research released a report (the "Report") detailing multiple issues plaguing TMC, including that:

(i) the Company had overpaid on licenses to potential undisclosed insiders; (ii) the Company had artificially inflated exploration expenses by more than 100% in order to mislead investors about the scale of its operations; (iii) there are reasons to question the Company's ownership claim of NORI; and (iv) the Company's history of affiliating with bad actors.

40.    The Report stated that "TMC siphoned US$43 million in cash and stock to undisclosed insiders by overpaying for Tong Offshore Mining Limited ('TOML')."  According to the Report, the TOML should be valued similarly to the licenses of NORI and Marawa at US$250,000 each.  The Report explained that NORI's previous owner, Nautilus Minerals Inc. ("NMI") valued the TOML exploration license in its historical annual reports at zero.  The Report also stated, in pertinent part, that:

> In 2019, PwC was the Monitor for NMI's restructuring process and tried to find a buyer for NMI's assets through a court-approved sale and investment solicitation plan ("SISP").  PwC Monitor's Second Report to Court dated June 12, 2019 ("PwC's 2nd Report") included results from the SISP which disclosed *that none of the approximately 300 potential bidders valued the entirety of NMI's assets above US$ 23 million* (the amount NMI owed DSMF) and that at least three final qualified buyers had "little to no interest in intellectual property, resource licenses, or contracts."

> *            *            *

> PwC Monitor's Third Report to Court dated July 23, 2019 ("PwC's 3rd Report") included the acquisition agreement between DSMF and NMI which clearly disclosed that NMI's assets were thought of as two separate but technologically complementary deep sea mining businesses (CCZ and Papua New Guinea).

> PwC's 3rd Report also revealed an existing ongoing relationship between NMI and DeepGreen since 2013 via a "Minerals Royalty Deed" which included TOML, NORI & Deepgreen Resources Inc.

> *TMC failed to disclose to investors its pre-existing relationship with TOML dated back to 2013.*

> *NMI carried the TOML license at zero on its financial statements up until bankruptcy.*

\*      \*      \*

TMC is pre-revenue so it relies on its CCZ exploration licenses to entice investor interest. We think TMC's TOML exploration license should be valued similarly to the NORI and Marawa licenses at ~US$250,000 each, if not at zero like Lockheed Martin.

Instead, TMC valued the TOML license at US$ 43 million.

\*      \*      \*

So why would DeepGreen pay US$ 4 million cash and 7.8 million TMC shares to acquire a license if it could just fill out another application with any one of the 167 ISA member nations or the European Union and pay US$ 250,000?

**We believe the TOML license acquisition was a payout to undisclosed insiders at the expense of misled minority TMC shareholders.**

(Emphasis added).

41.     The Report also alleged that TMC artificially inflated its 2019 exploration expenses

to "giv[e] investors a false scale of its operations."  The Report stated, in pertinent part:

TMC's SEC filings disclosed historical exploration expenses for its NORI and Marawa projects.

As part of its reporting requirements, the ISA maintains public records of exploration expenses towards each license. ISA public records matched TMC's SEC-reported figures for Marawa's 2019 exploration expenditures **but were significantly lower for NORI**.

**ISA public records disclosed actual 2019 exploration expenditures for NORI was only US$ 15 million, significantly lower than the US$ 34 million disclosed to investors in TMC's SEC filings.**

To us, the evidence suggests TMC overstated its NORI exploration expenditures in its SEC filings to give investors a false scale of its operations.

**Exploration Expenses for CY2019**

| USD | NORI | Marawa |
|---|---|---|
| **Disclosed by TMC** | | |
| Exploration labour | 1,635,858 | 895,165 |
| Marine cruise | 27,039,041 | 1,120,737 |
| External consulting | 4,834,170 | 563,210 |
| **Total disclosed by TMC** | **33,509,069** | **2,579,112** |
| | | |
| **Total disclosed by ISA** | **14,956,072** | **2,650,946** |
| | | |
| **Overstatement by TMC** | **18,552,997** | **(71,834)** |
| *Overstatement %* | *124%* | *(3%)* |

*Source: TMC S-4, ISA NORI Public Information, ISA Marawa Public Information*
*https://isa.org.jm/files/files/documents/Public%20information%20on%20contracts%20NORI.pdf*
*https://isa.org.jm/files/files/documents/Public%20information%20on%20contracts%20Marawa.pdf*

(Emphasis added).

42.     Finally, the Report questioned the validity of TMC's ownership claim of NORI.

The Report stated, in pertinent part:

There are also reasons to question TMC's ownership claim of NORI.

TMC claimed in its S-4 that it owns 100% interest in NORI.

***However, NORI's exploration license application to the ISA disclosed that NORI was wholly owned by two Nauruan foundations and that all future income from NORI would be used in Nauru.***

(Emphasis added).

43.     On this news, TMC shares fell $0.32 per share, or over 7%, to close at $4.14 per share on October 6, 2021, further damaging investors.

44.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

45.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of TMC during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

46.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

47.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

48.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

50.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

51.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ, and was covered by market analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)     Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

52.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

53.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v.*

*United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

54.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.     This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

56.     During the Class Period, the Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

57.     The Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

58.     The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

59.     Defendants Barron and Leonard, who are a senior officers and directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

60.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period.  In ignorance of the falsity of the Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

61.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Defendants' misleading statements and by the material adverse information which the Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

62.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

63.     By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

64.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65.     During the Class Period, Defendants Barron and Leonard participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

66.     As officers and directors of a publicly owned company, Defendants Barron and Leonard had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

67.     Because of their positions of control and authority as senior officers, Defendants Barron and Leonard were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, Defendants Barron and Leonard exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  Defendants Barron

and Leonard, therefore, were each a "controlling person[]" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

68.     Defendants Barron and Leonard, therefore, acted as controlling persons of the Company.  By reason of their senior management positions and being a director of the Company, Defendants Barron and Leonard had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.  Defendants Barron and Leonard exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

69.     By reason of the above conduct, Defendants Barron and Leonard are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  November 15, 2021

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Thomas H. Przybylowski
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
tprzybylowski@pomlaw.com

*Counsel for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1. I, _Phuoc Chan Tran_____,
make this declaration pursuant to Section 27(a)(2) of the
Securities Act of 1933 ("Securities Act") and/or Section 21D(a)
(2) of the Securities Exchange Act of 1934 ("Exchange Act") as
amended by the Private Securities Litigation Reform Act of
1995.

2. I have reviewed a Complaint against TMC the metals
company Inc. ("TMC" or the "Company") and authorize the
filing of a comparable complaint on my behalf.

3. I did not purchase or acquire TMC securities at the
direction of plaintiffs' counsel or in order to participate in any
private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of
a Class of investors who purchased or otherwise acquired TMC
securities during the class period, including providing testimony
at deposition and trial, if necessary.  I understand that the Court
has the authority to select the most adequate lead plaintiff in this
action.

5. The attached sheet lists all of my transactions in TMC
securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which
this Certification is signed, I have not served or sought to serve
as a representative party on behalf of a class under the federal
securities laws.

7. I agree not to accept any payment for serving as a
representative party on behalf of the class as set forth in the
Complaint, beyond my pro rata share of any recovery, except
such reasonable costs and expenses directly relating to the
representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury that the foregoing is
true and correct.


Executed _____09-29-2021_____
      **(Date)**


_____
**(Signature)**


_____Phuoc Chan Tran_____
**(Type or Print Name)**

**TMC the metals company Inc. (TMC)**                                      **Phuoc Chan Tran**

**List of Purchases and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
| --- | --- | --- | --- |
| Purchase | 9/29/2021 | 450 | $4.5000 |